# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
June 15, 1999 Session

## DAVID SWETT, SR. v. GRACE Z. ALEMAN SWETT

**Appeal from the Circuit Court for Davidson County**
**No. 96D-2516      Muriel Robinson, Judge**

---

**No. M1998-00961-COA-R3-CV - Filed June 27, 2002**

---

This appeal involves the dissolution of a nine-year marriage.  Following a bench trial in the Circuit Court for Davidson County, the trial court found both parties to be at fault but awarded the divorce to the wife.  The court also granted the parties joint custody of their son and divided their property. On this appeal, the wife asserts that the trial court erred by concluding that her conduct contributed to the divorce and by refusing to give her sole custody of the parties' son.  Both parties take issue with the manner in which the trial court divided their property.  The wife asserts that the trial court erred by classifying the husband's interest in the real property on which his family's restaurant is located as separate property and by failing to award her a portion of the appreciation in the value of his family restaurant business.  The husband takes issue with the trial court's refusal to award him certain items of household furnishings.  Finally, the wife asserts that she is entitled to post-judgment interest on the judgment used to equalize the distribution of the marital estate, as well as her legal expenses incurred on appeal.  We have determined that the trial court's fault determination, joint custody arrangement, and division of marital property are supported by the record. Accordingly, we affirm the judgment and deny the wife's request for appellate legal expenses.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM B. CAIN, J., joined.

Joe P. Binkley, Jr., Nashville, Tennessee, for the appellant, Grace Zuniga Aleman Swett.

Lucinda E. Smith, Nashville, Tennessee, for the appellee, David Swett, Sr.

### OPINION

### I.

David Swett met Grace Z. Aleman Swett in 1984 while vacationing in Costa Rica.  Ms. Swett was working in the beauty salon in the hotel where Mr. Swett was staying.  The parties were married in November 1985 in Costa Rica and made their home in Nashville where Mr. Swett and his family

operated a popular restaurant. In January 1986, Ms. Swett's two sons from an earlier marriage came to live with the parties in Nashville. Their only son was born in November 1987. The parties' relationship began to deteriorate soon after their wedding. According to Ms. Swett, Mr. Swett became verbally and physically abusive toward her, refused to help her obtain a driver's license, and discouraged her from obtaining work outside the home. For his part, Mr. Swett asserted that Ms. Swett nagged him and viewed him only as a source of income and that the parties argued frequently about one of Ms. Swett's sons from her earlier marriage.

One of the events that precipitated the eventual unraveling of this marriage occurred in late 1992 when Mr. Swett discovered that one of Ms. Swett's sons had taken $300 from his wallet. The boy asserted that the money represented unpaid wages for working in Mr. Swett's restaurant and declared that he would steal money again if given the chance. Mr. Swett insisted that the boy leave the house and paid to fly him back to Costa Rica to live with his grandmother. The boy eventually returned to Nashville in 1993 but no longer lived with the Swetts. Ms. Swett remained distressed and angry that Mr. Swett would not permit her son to live with them.

The parties began sleeping in separate bedrooms in June 1996. Following a particularly contentious argument in July 1996, Mr. Swett threatened Ms. Swett and told her that he intended to leave with their child. Ms. Swett petitioned for an order of protection and filed criminal charges against Mr. Swett following this incident. Thereafter, on August 30, 1996, Mr. Swett filed a complaint in the Circuit Court for Davidson County, seeking a divorce on the grounds of irreconcilable differences and inappropriate marital conduct.

The parties apparently continued to reside in the same house after Mr. Swett filed for divorce. Their relationship did not improve, and in November 1996, Ms. Swett filed an amended petition for an order of protection claiming that Mr. Swett had verbally and physically abused her in front of their child.[1] Ms. Swett also filed a counterclaim for divorce asserting that the parties could no longer live together as husband and wife and that the sole cause of the deterioration of the marriage was Mr. Swett's continuous verbal and physical abuse. During the same month, Ms. Swett surreptitiously took two of Mr. Swett's checks and cashed them for $20,700. She used $17,000 to purchase an automobile for one of her older sons and the remaining $3,700 for her living expenses.

Following a bench trial, the trial court determined that both parties had demonstrated that they had grounds for divorce. However, despite its concern about Ms. Swett's evasiveness and the lack of corroboration for many of her allegations of misconduct by Mr. Swett, the trial court also found that Ms. Swett was less at fault and awarded her a divorce on the ground of inappropriate marital conduct. The court granted the parties joint custody of their son and determined that he would reside with Mr. Swett during the first six months of each year and with Ms. Swett during the second six months. After concluding that Mr. Swett's interest in the family restaurant business was separate property, the trial court awarded marital property valued at $254,889.60 to Mr. Swett and

---

[1]No orders of protection were ever issued. Mr. Swett resolved the criminal charges against him by agreeing to pretrial diversion which was not conditioned on obtaining any sort of treatment or participating in any sort of domestic violence program.

marital property valued at $7,500 to Ms. Swett. To equalize the distribution, the trial court directed Mr. Swett to pay Ms. Swett $140,000 within sixty days of the entry of the judgment. The court also directed Mr. Swett to pay Ms. Swett $1,300 in child support during the six months that the child was living with her and awarded Ms. Swett $600 per month in rehabilitative spousal support for sixty months.

While the parties do not take issue with the child support award or the award of rehabilitative alimony, they take issue with other portions of the judgment. Because the issues in a divorce proceeding dovetail with each other, the court should follow a consistent, logical sequence in disentangling the parties' affairs. For most divorce proceedings, this sequence is: (1) determining whether either or both parties are entitled to a divorce; (2) fashioning custody and visitation arrangements; (3) allocating the parties' separate property and debts; (4) equitably dividing the marital property and debts; (5) awarding child support; (6) awarding spousal support; and (7) considering whether to award attorneys' fees if either party has requested them. *Anderton v. Anderton*, 988 S.W.2d 675, 679 (Tenn. Ct. App. 1998). We will consider the issues raised by the Swetts in this order.

## II.
### THE PARTIES' FAULT

Despite the fact that she was awarded the divorce on the ground of inappropriate marital conduct, Ms. Swett insists that the trial court erred by finding that her conduct during the marriage gave Mr. Swett grounds for divorce. She asserts that she is blameless. We disagree.

Appellate courts employ the familiar standard in Tenn. R. App. P. 13(d) to review a trial court's findings of fact regarding the grounds for divorce. *Earls v. Earls*, 42 S.W.3d 877, 911 (Tenn. Ct. App. 2000); *Hobbs v. Hobbs*, 987 S.W.2d 844, 846 (Tenn. Ct. App. 1998). This standard requires us to defer to the trial court's findings of fact, *Fell v. Rambo*, 36 S.W.3d 837, 846 (Tenn. Ct. App. 2000), and to presume that these findings are correct "unless the preponderance of the evidence is otherwise." This presumption, however, does not come into play when the trial court has not made specific findings of fact on a particular matter. *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001); *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000).

Reviewing findings of fact under Tenn. R. App. P. 13(d) necessarily requires an appellate court to weigh the evidence to determine in which party's favor the aggregate weight of the evidence falls. The prevailing party is the one in whose favor the evidentiary scale tips, no matter how slightly. *McBee v. Bowman*, 89 Tenn. 132, 140, 14 S.W. 481, 483 (1890). Accordingly, the presumption of correctness in Tenn. R. App. P. 13(d) requires us to leave a trial court's finding of fact undisturbed unless we determine that the aggregate weight of the evidence demonstrates that a factual finding other than the one found by the trial court is more probably true. *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999).

Our review of a trial court's findings of fact is constrained by the practical recognition that the trial judge, as the trier-of-fact, has a better opportunity to observe the manner and demeanor of

all the witnesses when they testify. *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997); *Lindsey v. Lindsey*, 930 S.W.2d 553, 556 (Tenn. Ct. App. 1996). Accordingly, we give great weight to a trial court's factual findings when they rest on the trial court's determination of the credibility of the witnesses. *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996); *Hobbs v. Hobbs*, 987 S.W.2d at 847; *Umstot v. Umstot*, 968 S.W.2d 819, 825 (Tenn. Ct. App. 1997).

The record contains adequate evidence to support a finding that Ms. Swett's conduct was, at least to some degree, responsible for the dissolution of this marriage. Mr. Swett testified that she was constantly argumentative, that she never truly cared for him, and that she only married him for his money. Moreover, Ms. Swett did not appropriately discipline her son when he stole $300 from Mr. Swett, and she herself took two checks from Mr. Swett and cashed them for $20,700. After reviewing the record as a whole, we decline to conclude that the evidence preponderates against the trial court's factual conclusion that Ms. Swett's conduct contributed to the dissolution of this marriage.

## III.
### THE JOINT CUSTODY ARRANGEMENT

Ms. Swett also asserts that the trial court erred by granting the parties joint custody of their son. She asserts that she should have been awarded sole custody because of Mr. Swett's propensity for verbal and physical abuse and because it is unsettling to a child to be physically shuttled between two parents. We have determined that the record does not undermine the trial court's custody arrangement.

### A.

Custody and visitation arrangements are among the most important decisions confronting a trial court in a divorce case. *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001). Courts must strive to devise custody arrangements that promote the development of the children's relationship with both parents and interfere as little as possible with post-divorce family decision-making. *Aaby v. Strange*, 924 S.W.2d 623, 629 (Tenn. 1996); *Taylor v. Taylor*, 849 S.W.2d 319, 331-32 (Tenn. 1993). The needs of the children are paramount, while the desires of the parents are secondary. *Lentz v. Lentz*, 717 S.W.2d 876, 877 (Tenn. 1986). Custody should never be used to punish or reward the parents, *Turner v. Turner*, 919 S .W.2d 340, 346 (Tenn. Ct. App. 1995); *Long v. Long*, 488 S.W.2d 729, 733 (Tenn. Ct. App. 1972), but rather should be used to promote the children's best interests by placing them in an environment that will best serve their physical and emotional needs. *Luke v. Luke*, 651 S.W.2d 219, 221 (Tenn. 1983).

There are no hard and fast rules for determining which custody and visitation arrangement will best serve a child's needs. *Taylor v. Taylor*, 849 S.W.2d at 327; *Dantzler v. Dantzler*, 665 S.W.2d 385, 387 (Tenn. Ct. App. 1983). The inquiry is factually driven and requires the courts to carefully weigh numerous considerations. *Nichols v. Nichols*, 792 S.W.2d 713, 716 (Tenn. 1990); *Rogero v. Pitt*, 759 S.W.2d 109, 112 (Tenn. 1988). The Tennessee General Assembly and the courts

have identified the factors that the trial courts should consider. Tenn. Code Ann. § 36-6-106(a) (2001); *Bah v. Bah*, 668 S.W.2d 663, 666 (Tenn. Ct. App. 1983).

Courts customarily devise initial custody and visitation arrangements by engaging in a comparative fitness analysis that requires them to determine which of the available custodians is comparatively more fit than the other. *In re Parsons*, 914 S.W.2d 889, 893 (Tenn. Ct. App. 1995); *Bah v. Bah*, 668 S.W.2d at 666. This analysis does not measure the parents against the standard of perfection because the courts are pragmatic enough to understand that perfection in marriage and parenting is as evanescent as it is in life's other pursuits. *Earls v. Earls*, 42 S.W.3d 877, 885 (Tenn. Ct. App. 2000); *Rice v. Rice*, 983 S.W.2d 680, 682-83 (Tenn. Ct. App. 1998). Rather, the analysis requires the courts to determine which of the parents, in light of their present circumstances, is comparatively more fit to assume and discharge the responsibilities of being a custodial parent.

Custody and visitation decisions often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves. *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). Accordingly, appellate courts are reluctant to second-guess a trial court's decisions. Trial courts must be able to exercise broad discretion in these matters, but they still must base their decisions on the proof and upon the appropriate application of the relevant principles of law. *D v. K*, 917 S.W.2d 682, 685 (Tenn. Ct. App. 1995). Thus, we review these decisions de novo on the record with a presumption that the trial court's findings of fact are correct unless the evidence preponderates otherwise. *Nichols v. Nichols*, 792 S.W.2d at 716; *Doles v. Doles*, 848 S.W.2d 656, 661 (Tenn. Ct. App. 1992).

### B.
### MR. SWETT'S FITNESS TO BE A CUSTODIAL PARENT

The primary issue regarding custody stems from Ms. Swett's assertion that the trial court erred by determining that Mr. Swett was fit to have custody of the parties' son. She argues dramatically that "[t]he record in this case in [sic] replete with evidence that Husband is a violent, irrational person who, for a period of ten years, has physically and verbally abused Wife, her sons, and his children from a prior marriage." Mr. Swett responds that he and the parties' son have a normal, loving father-son relationship and that he was the sole and willing provider of essential medical and dental care and private schooling and tutoring for the child. In this case, as in most custody disputes, there are two sides to the story, and the truth lies somewhere in between.

It would serve little purpose in this case to recite the lengthy litany of the factors listed in Tenn. Code Ann. § 36-6-106(a)[2] that guide a trial court's discretion when assessing parental fitness. Our review of the record satisfies us that many of these factors do not favor either parent, and some actually favor Mr. Swett. Ms. Swett's testimony that the child fears Mr. Swett is not borne out by the evidence. There is, in fact, no evidence that the love and affection between the child and Ms. Swett are greater than between the child and Mr. Swett. Mr. Swett's ability and willingness to

---

[2]Because this case was tried before January 1, 2001, the effective date of Tenn. Code Ann. §§ 36-6-401, -414 (2001), the statutes requiring the use of parenting plans in custody proceedings, the disposition of the custody issues is governed by the statutes applicable to proceedings that pre-dated the parenting plan statutes.

provide the parties' son with food, clothing, medical care, private education, and other necessities exceeds Ms. Swett's. In addition, Mr. Swett has involved himself with the child's school activities and has taken a direct interest in supervising his education. He is also part of a large, stable family that supports both him and the parties' son. Accordingly, we have no basis for concluding that the evidence preponderates against the trial court's conclusion that Mr. Swett is qualified to be a custodial parent.

## C.
### THE JOINT AND DIVIDED CUSTODY ARRANGEMENT

Ms. Swett also takes issue with the trial court's decision to establish a "joint custody" arrangement. She asserts that joint custody cannot work because of Mr. Swett's "strong desire to control," his "refusal . . . to compromise," and the "utter lack of communication between the parties." There can be no doubt that the relationship between the Swetts has deteriorated to the point where they find it difficult to be civil to each other. However, the divided custody arrangement devised by the trial court, minimizes the possibility of friction and disagreements between the Swetts with regard to their son.

### 1.

The concept of joint custody was evolving when this case was tried and continues to evolve today. It connotes an arrangement in which both parents retain legal responsibility and authority for the care and control of the child. Much as in an intact family, both parents have equal rights and responsibilities regarding major decisions, and neither parent's rights are superior. Thus, both parents have an equal voice in the child's education, upbringing, religious training, non-emergency health care, and general welfare. *Anderson v. Anderson*, 56 S.W.3d 5, 8 (Tenn. Ct. App. 1999); *Shepherd v. Metcalf*, 794 S.W.2d 348, 351 (Tenn. 1990); *Hoefler v. Hoefler*, No. M1998-00966-COA-R3-CV, 2001 WL 327897, at *5 (Tenn. Ct. App. Apr. 5, 2001) ( No Tenn. R. App. P. 11 application filed). The parent with whom the child is residing at the time must make immediate and day-to-day decisions regarding discipline, grooming, diet, activities, scheduling social contacts, and emergency care.[3]

Tenn. Code Ann. § 36-6-101(a)(1) (2001) specifically recognizes that trial courts may award custody to either party, to both parties "in the instance of joint custody or shared parenting,"[4] or to a third party. Unlike other states, Tennessee has not enacted a statutory "one size fits all" preference

---

[3]Eliza B. Hutchinson, Note, *Improving Custody Law in Virginia Without Creating a Rebuttable Presumption of Joint Custody*, 4 Wm. & Mary J. of Women & L. 523, 525 (1998).

[4]Our statutes do not define what a "shared parenting" arrangement is. The term is generally traced to the parenting statutes enacted by the State of Washington in 1987 that were outgrowths of the push during the 1980s for laws favoring joint custody. In these statutes, the term "joint custody" was replaced with the term "shared parenting." Accordingly, in common parlance, the term "joint custody" and "shared parenting" are interchangeable, even though the term "shared parenting" is now more closely associated with the parenting plans required by Tenn. Code Ann. §§ 36-6-401, -414. Pragmatically, "shared parenting" means that the parents share all or a portion of the legal and physical care of their children.

for one type of custody arrangement over another except in circumstances where the parents have agreed to a joint custody arrangement. In this regard, Tenn. Code Ann. § 36-6-101(a)(2) states that trial courts have the "widest discretion to order a custody arrangement that is in the best interest of a child" and that there exists "neither a preference nor a presumption for or against joint legal custody, joint physical custody or sole custody."

Joint custody is most appropriate when the joint decision-makers are predisposed to, or at least capable of, amicably resolving potential disagreements over raising their child or children. *Jahn v. Jahn*, 932 S.W.2d 939, 942 (Tenn. Ct. App. 1996) (emphasizing that a "cooperative spirit" is essential to any joint custody arrangement); *Jones v. Jones*, No. 01A01-9601-CV-00038, 1996 WL 512030, at *5 (Tenn. Ct. App. Sept. 11, 1996) (No Tenn. R. App. P. 11 application filed); *Dix v. Carson*, No. 02A01-9704-CV-00093, 1998 WL 886555, at *11 (Tenn. Ct. App. Dec. 17, 1998), *perm. app. denied* (Tenn. June 21, 1999). The chances that joint custody will succeed improve when the parents have some pre-existing relationship and a proven track record of effectively sharing parental obligations and responsibilities. The chance of success diminishes when the parents have turned child raising into a battleground. Accordingly, the courts have been forced to recognize that, as a practical matter, a joint custody arrangement requires a level of cooperation that not all parents can provide.

The courts have frequently been called upon to rework joint custody arrangements that have failed despite the parents' best intentions. Joint custody is no longer in a child's best interests when the parents are no longer able to cooperate. *Gray v. Gray*, 885 S.W.2d 353, 355 (Tenn. Ct. App. 1994); *Malone v. Malone*, 842 S.W.2d 621, 623 (Tenn. Ct. App. 1992); *Dodd v. Dodd*, 737 S.W.2d 286, 289-90 (Tenn. Ct. App. 1987). Accordingly, notwithstanding the parents' initial agreement to a joint custody arrangement, the inability of parents to cooperate with regard to their children constitutes a significant enough change in the child's circumstances to trigger a reconsideration of the existing custody arrangement. *Vaccarella v. Vaccarella*, 49 S.W.3d 307, 315-16 (Tenn. Ct. App. 2001); *Rubin v. Kirshner*, 948 S.W.2d 742, 745-46 (Tenn. Ct. App. 1997); *Dalton v. Dalton*, 858 S.W.2d 324, 326 (Tenn. Ct. App. 1993); *Cheek v. Cheek*, No. 03A01-9503-CV-00092, 1995 WL 507793, at *2 (Tenn. Ct. App. Aug. 29, 1995), *perm. app. denied* (Tenn. Jan. 8, 1996).

**2.**

In light of the overwhelming evidence of the vitriolic relationship between the Swetts, it must have been apparent to the trial court that forcing them to collaborate in a joint custody arrangement would have little chance of long-term success. A typical joint custody arrangement could, in fact, not have been in their son's best interests because it could have undermined the psychological well-being of his parents and could also have exposed him to high levels of parental conflict. The trial court must have sensed these problems because the custody arrangement it devised, while called "joint custody," bears few similarities with the concept of joint custody as it is customarily understood.

The trial court's order minimizes the need for the Swetts to collaborate to make major decisions regarding their child. It divides physical custody between the parents. Mr. Swett has custody of the boy for the first six months of the year, and Ms. Swett has custody for the second six

months.  During the time that each parent has physical custody, the order gives the parent "final decision-making authority regarding the child," except for educational and, perhaps, medical matters. Mr. Swett has sole authority over the selection of the child's private school.  He also plays the primary role in meeting the child's medical and dental needs because he is solely responsible for obtaining medical and dental insurance and for paying for any of the child's medical and dental expenses that are not covered by insurance.

As we understand the custody arrangement in this case, Mr. Swett and Ms. Swett effectively have sole custody while the child is residing with them. Except for education and medical care, Ms. Swett has the sole prerogative to raise the boy as she pleases during the time he is living with her, and Mr. Swett has the sole prerogative to raise the boy as he pleases during the time he is living with him.  The only explicit limitations on these prerogatives are: (1) mandated adherence to the rights of the non-custodial parent in Tenn. Code Ann. § 36-6-101(a)(3), (2) non-interference with "the other's custodial period with the child," and (3) restriction against "alienating the affection of the minor child from the other parent."[5]

The divided custody arrangement devised by the trial court does not completely eliminate the potential for disputes or disagreements between the parents.[6]  However, in most matters, it avoids requiring the parents to be joint decision-makers.  It does not, as we see it, require a level of cooperation between the Swetts that they are unable to provide.  Accordingly, we have no basis to unravel the trial court's custody arrangement in this case simply because the trial court called it "joint" custody.

### 3.

Ms. Swett also takes issue with the trial court's decision to divide the custody of the parties' son, thereby requiring the boy to change his residence every six months.  She characterizes this arrangement as a "revolving door"[7] and asserts that it is too disruptive for the child.  Tennessee's appellate courts have never held that dividing physical custody between parents and thereby requiring a child to periodically change his or her residence is per se improper.  The propriety of this sort of arrangement depends on the facts of each case.

Almost sixty years ago, this court found that alternating custody of a 5-year-old child every two weeks was "very unwise . . . because it is hardly possible for a child to grow up and live a normal, happy life under such circumstances." *Logan v. Logan*, 26 Tenn. App. 667, 674, 176 S.W.2d 601, 603 (1943).  Six years later, Judge Winfield Hale observed that "[s]o long as there is a divided custody there will probably be bickerings and disputes and a natural tendency on the part

---

[5]In addition, Mr. Swett is also specifically enjoined from "physically abusing or threatening Mrs. Swett and from making any derogatory remarks regarding Mrs. Swett."

[6]The record indicates that the parties' child-raising philosophies may differ.  Accordingly, the parents could make different decisions regarding the child's religious upbringing or choice of friends.

[7]*Garner v. Garner*, 773 S.W.2d 245, 247 (Tenn. Ct. App. 1989) (Koch, J., dissenting).

of the child to play one against the other, as well as for the claimants to seek by indulgences to curry favor with the child, if not to prejudice it against the other." *Dunavant v. Dunavant*, 31 Tenn. App. 634, 647-48, 219 S.W.2d 910, 915 (1949). Reflecting these concerns, the court has used the following three criteria in other cases to determine whether a divided custody arrangement is appropriate: (1) whether the parents agreed to the arrangement,[8] (2) whether the parents lived in sufficiently close proximity to make the arrangement feasible,[9] and (3) whether the child was old enough to express a preference about with which parent he or she would prefer to live.[10] As a general matter, the court has let stand divided custody arrangements involving young children, even in the absence of parental agreement, where there is no evidence that dividing custody will be unduly disruptive for the child. *Garner v. Garner*, 773 S.W.2d at 246.

The propriety of a divided custody arrangement should be analyzed by focusing on the effect it will have on the child. The analysis should proceed from the recognition that children thrive in stable environments, *Aaby v. Strange*, 924 S.W.2d at 627; *Gorski v. Ragains*, No. 01A01-9710-GS-00597, 1999 WL 511451, at *4-5 (Tenn. Ct. App. July 21, 1999) (No Tenn. R. App. P. 11 application filed); National Interdisciplinary Colloquium on Child Custody, *Legal and Mental Health Perspectives on Child Custody Law: A Deskbook for Judges* § 5:1, at 51 (1998), and, therefore, that stability and continuity of placement are important considerations in custody cases. *Taylor v. Taylor*, 849 S.W.2d at 328; *Contreras v. Ward*, 831 S.W.2d 288, 290 (Tenn. Ct. App. 1991). Thus, the factors that should be considered whenever a divided custody arrangement is contemplated include: (1) the duration of each parent's physical custody and the frequency of the required changes in the child's residence, (2) the effect of the arrangement on the child's relationship with his or her parents and other family members, (3) the effect of the arrangement on the child's education, (4) the effect of the arrangement on the child's religious upbringing, (5) the effect of the arrangement on the child's social relationships, (6) the effect of the arrangement on the continuity of the child's medical and dental care, and in appropriate circumstances, (7) the child's preference.

This record contains surprisingly little information regarding the effect that a divided custody arrangement will have on the Swetts' son. Because he is enrolled in private school, we presume that it will have little, if any, effect on his education. Because his parents will apparently continue to live

---

[8]*Bailey v. Bailey*, No. M2000-00325-COA-R3-CV, 2001 WL 310642, at *1 (Tenn. Ct. App. Apr. 2, 2001) (No Tenn. R. App. P. 11 application filed); *Burkhart v. Burkhart*, No. M1999-02332-COA-R3-CV, 2000 WL 1231371, at *7 (Tenn. Ct. App. Aug. 31, 2000) (No Tenn. R. App. P. 11 application filed). The first parenting plan legislation also conditioned the child's alternating residences on the parents' agreement. Tenn. Code Ann. § 36-6-411(e)(2)(B) (repealed 2000). However, the requirement of parental agreement was removed from the current version of the parenting plan statutes enacted in 2000.

[9]*Burke v. Burke*, No. M2000-01111-COA-R3-CV, 2001 WL 921770, at *3 (Tenn. Ct. App. Aug. 7, 2001) (No Tenn. R. App. P. 11 application filed) (parents homes were more than fifty miles apart); *Rowles v. Reynolds*, 29 Tenn. App. 224, 234, 196 S.W.2d 76, 80 (1946) (parents lived in different states).

[10]*State ex rel. French v. French*, 182 Tenn. 606, 615, 188 S.W.2d 603, 606 (1945); *Garner v. Garner*, 773 S.W.2d at 246 (permitting a divided custody arrangement for a child who was not yet old enough to attend school); *Rowles v. Reynolds*, 29 Tenn. App. at 233-35, 196 S.W.2d at 80-81 (observing that divided custody could be appropriate for children who were too young to express a preference).

in the same community, divided custody should have little practical effect on the child's medical and dental care, his religious upbringing, his relationship with other family members, or his ability to develop and maintain friendship with his peers. Accordingly, we find that the record does not contain sufficient facts to warrant second-guessing the trial court's decision – at least as the circumstances stood at the time of trial. However, as we noted in *Garner v. Garner*, children's circumstances change as they mature. The Swetts' son is approaching the age when his desires with regard to his living arrangements merit serious consideration. Accordingly, the trial court should revisit the issue of divided custody should the boy state unequivocally that he desires to stop alternating his living arrangements.

## IV.
### THE DIVISION OF THE MARITAL PROPERTY

Both parties take issue with the manner in which the trial court classified and divided the parties' property. Ms. Swett asserts that the trial court erred by classifying the real property on which the family restaurant is located as Mr. Swett's separate property and by failing to award her part of the increase in the value of the restaurant business during the marriage. For his part, Mr. Swett argues that the trial court should have awarded him several items of personal property that he left behind when he left the marital residence. We have determined that the trial court correctly classified the parties' property and that the manner in which it divided the parties' marital property was essentially equitable.

### A.

Dividing a marital estate necessarily begins with the classification of the property as either separate or marital property. *Anderton v. Anderton*, 988 S.W.2d at 679; *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996). The definitions of "separate property" and "marital property" in Tenn. Code Ann. § 36-4-121(b) (2001) provide the ground rules for the task. Once the property has been classified, the trial court's goal is to divide the marital property in an essentially equitable manner. *Kinard v. Kinard*, 986 S.W.2d 220, 230 (Tenn. Ct. App. 1998). A division is not rendered inequitable simply because it is not precisely equal, *Cohen v. Cohen*, 937 S.W.2d 823, 832 (Tenn. 1996); *Bookout v. Bookout*, 954 S.W.2d 730, 732 (Tenn. Ct. App. 1997), or because each party did not receive a share of every piece of marital property. *King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998); *Brown v. Brown,* 913 S.W.2d 163, 168 (Tenn. Ct. App. 1994).

Dividing a marital estate is not a mechanical process but rather is guided by considering the factors in Tenn. Code Ann. § 36-4-121(c). *Kinard v. Kinard*, 986 S.W.2d at 230. Trial judges have wide latitude in fashioning an equitable division of marital property, *Fisher v. Fisher,* 648 S.W.2d 244, 246 (Tenn. 1983); *Brown v. Brown,* 913 S.W.2d at 168, and appellate courts accord great weight to a trial court's division of marital property. *Wilson v. Moore,* 929 S.W.2d 367, 372 (Tenn. Ct. App. 1996); *Edwards v. Edwards,* 501 S.W.2d 283, 288 (Tenn. Ct. App. 1973). Thus, we will ordinarily defer to the trial court's decision unless it is inconsistent with the factors in Tenn. Code Ann. § 36-4-121(c) or is not supported by a preponderance of the evidence. *Brown v. Brown,* 913

S.W.2d at 168; *Mahaffey v. Mahaffey,* 775 S.W.2d 618, 622 (Tenn. Ct. App. 1989); *Hardin v. Hardin,* 689 S.W.2d 152, 154 (Tenn. Ct. App. 1983).

## B.
### THE PROPERTY AND INCOME RELATING TO MR. SWETT'S FAMILY BUSINESS

Ms. Swett asserts that the trial court erred by classifying Mr. Swett's interest in the real property owned by Swett Properties, Inc. as separate property. She also insists that the trial court erred by declining to award her any of the income from Swett's Restaurant, Inc. and any of the increase in the value of Swett's Restaurant, Inc. during the marriage. We have determined that the trial court properly classified the real property as Mr. Swett's separate property and that Ms. Swett did not establish that she was entitled to any of the restaurant income or the increase in the value of the restaurant business during the marriage.

### 1.

Separate property cannot be included in a marital estate. *Dunlap v. Dunlap*, 996 S.W.2d 803, 814 (Tenn. Ct. App. 1998); *Brock v. Brock*, 941 S.W.2d 896, 900 (Tenn. Ct. App. 1996). Thus, a party seeking to include in the marital estate property claimed to be separate property by the other party has the burden of proving that the property fits within the statutory definition of marital property. *Kinnard v. Kinnard*, 916 S.W.2d at 232. Because property classification issues are questions of fact, *Mitts v. Mitts*, 39 S.W.3d 142, 145 (Tenn. Ct. App. 2000); *Brown v. Brown*, 913 S.W.2d at 167, appellate courts will review a trial court's classification decisions using the familiar standard of review in Tenn. R. App. P. 13(d).

Property, otherwise classifiable as separate property, may properly be treated as marital property in several circumstances. First, separate property can be transmuted into marital property if the parties treat it as marital property and if there is no evidence that the spouse owning the property intended it to remain separate. *Wright-Miller v. Miller*, 984 S.W.2d 936, 941 (Tenn. Ct. App. 1998); *McClellan v. McClellan*, 873 S.W.2d 350, 351 (Tenn. Ct. App. 1993). Second, the increase in value of separate property and the income derived from separate property can be treated as marital property if the nonowner spouse has made substantial contributions to the preservation or appreciation of the separate property itself. Tenn. Code Ann. § 36-4-121(b)(1)(B); *Cohen v. Cohen*, 937 S.W.2d at 832; *Harrison v. Harrison*, 912 S.W.2d 124, 126 (Tenn. 1995). For a nonowner spouse's contribution to be deemed "substantial," it must be real and significant. *Mitts v. Mitts*, 39 S.W.3d at 145; *Denton v. Denton*, 33 S.W.3d 229, 236 (Tenn. Ct. App. 2000). In addition, a nonowner spouse claiming the increase in the value of separate property as marital property must prove that the value of the separate property actually increased during the marriage. This necessarily involves proving the value of the property immediately prior to the marriage and its value at the time of the divorce. *Garfinkel v. Garfinkel*, 945 S.W.2d 744, 747 (Tenn. Ct. App. 1996); *Cutsinger v. Cutsinger*, 917 S.W.2d 238, 241 (Tenn. Ct. App. 1995).

**2.**

Mr. Swett's parents opened Swett's Restaurant in 1954 at 2725 Clifton Avenue in North Nashville. In 1979, Mr. Swett and his brother formed a partnership called Swett Enterprises to acquire the restaurant business from their father. Mr. Swett's father retained ownership of the real property on which the business was located. In April 1987, after Mr. Swett married Ms. Swett, his father sold the real property to Mr. Swett and his brother. Mr. Swett and his brother used the proceeds from the restaurant to pay their father for the real property. In 1988, the Swett brothers formed Swett Properties, Inc. to hold the real estate at 2725 Clifton Avenue.[11] They also executed a formal partnership agreement providing, among other things, for the continuation of the existing partnership under the name of Swett's Dinette.

Swett's Dinette operated as a partnership until Mr. Swett's brother died in April 1995. At that time, Mr. Swett became the sole owner of the business by operation of the partnership agreement. After Mr. Swett decided that he could not operate the business by himself, his two adult sons by an earlier marriage assumed roles in the business. Mr. Swett incorporated the business in January 1996 under the name of Swett's Restaurant, Inc.[12] He retained sixty percent of the business and conveyed a twenty percent interest to each of his two sons.

**3.**

Ms. Swett accepts that the restaurant business is Mr. Swett's separate property. However, she insists that the real property on which Swett's Restaurant is located is marital property solely because Mr. Swett and his brother acquired it after the parties were married.[13] This argument is without merit. The real property was purchased using income from the restaurant business which itself was separate property because there is no evidence that Ms. Swett contributed significantly to the restaurant's operation. Tenn. Code Ann. § 36-4-121(b)(2)(C). Separate property includes property acquired in exchange for separate property. Tenn. Code Ann. § 36-4-121(b)(2)(B). Therefore, any real property acquired in exchange for income from the restaurant is separate property. The trial court correctly excluded the real property at 2725 Clifton Avenue from the marital estate.

---

[11] The stipulated value of Swett's Properties, Inc. at time of trial was $355,300. Therefore, Mr. Swett's one-half interest in this corporation was worth $177,650.

[12] The stipulated value of Swett's Restaurant, Inc. at the time of trial was $255,000. It will be unnecessary for us to resolve the parties' dispute regarding the value of Mr. Swett's interest in this corporation for two reasons. First, there is no evidence in the record that the value of the business increased during the marriage. Second, we have determined that the trial court properly classified Mr. Swett's interest in the restaurant business as separate property.

[13] There is no evidence in the record that Mr. Swett ever treated his interest in the real property as marital property. Likewise, there is no evidence that Ms. Swett substantially contributed to the acquisition or preservation of this real property. Based on this record, there is little factual basis to argue that Ms. Swett's non-monetary and modest monetary contributions to the marriage were significant enough to be considered as substantial contributions to the acquisition or preservation of either the restaurant business or the real property on which the restaurant was located.

-12-

**4.**

Ms. Swett also asserts that the trial court erred by declining to include the appreciation in value of the restaurant business in the marital estate. We find two problems with this assertion. First, there is little evidence in the record to support finding that Ms. Swett's monetary and non-monetary contributions to the marriage substantially benefitted the restaurant. Second, Ms. Swett presented no evidence regarding the value of the restaurant business immediately before the parties' marriage. Accordingly, she has failed to prove that the value of the restaurant business appreciated during the marriage.[14] In the absence of this evidence, we cannot fault the trial court for declining to include the increase in the value of the restaurant business during the marriage in the marital estate.

**C.**
**THE AWARD OF PERSONAL PROPERTY**

Mr. Swett argues that the trial court erred by failing to award him the living room and sun room furniture. While the trial court awarded Ms. Swett all the personalty in the marital home, it awarded Mr. Swett (1) a grandfather clock purchased in memory of his brother, (2) one-half of the outdoor furniture, (3) furniture, collectibles, and entertainment equipment from the family room, (4) a hall tree, and (5) some Haitian carvings and sculptures. We have reviewed the manner in which the trial court divided the personalty in the marital home in light of the net effect of the division of the entire marital estate and have no basis to conclude that the trial court's decision did not divide the parties' marital estate equitably. The evidence does not preponderate against the manner in which the trial court divided the marital estate in this case.

**V.**
**MS. SWETT'S CLAIM FOR POST-JUDGMENT INTEREST**

Ms. Swett also argues that the trial court erred by ordering that the interest on the award of $140,000 should begin to accrue thirty days after the date the trial court announced its ruling. She contends that she is statutorily entitled to interest from the date the trial court announced its ruling. We disagree.

A party's right to post-judgment interest is based on its entitlement to the use of the proceeds of a judgment. *West Am. Ins. Co. v. Montgomery*, 861 S.W.2d 230, 232 (Tenn. 1993); *Vooys v. Turner*, 49 S.W.3d 318, 322 (Tenn. Ct. App. 2001). The purpose of post-judgment interest is to compensate a successful plaintiff for being deprived of the compensation for its loss between the time of the entry of the judgment awarding the compensation until the payment of the judgment by the defendant. *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835-36, 110 S. Ct. 1570, 1576 (1990). Accordingly, a party who enjoys the use of funds that should have been paid over to another party should pay interest on the retained funds. *Lucius v. City of Memphis*, 925

---

[14]During oral argument, Ms. Swett's counsel candidly conceded that the lack of evidence of the restaurant's value prior to the marriage was problematic.

S.W.2d 522, 526 (Tenn. 1996); *Stinnett v. Stinnett*, No. E2000-001210-COA-R3-CV, 2000 WL 1273880, at *4 (Tenn. Ct. App. Sept. 7, 2000) (No Tenn. R. App. P. 11 application filed).

The right to post-judgment interest is entirely statutory. *Owens v. State*, 710 S.W.2d 518, 518-19 (Tenn. 1986); *Bedwell v. Bedwell*, 774 S.W.2d 953, 956 (Tenn. Ct. App. 1989). Tenn. Code Ann. § 47-14-122 (2001) succinctly provides that "[i]nterest shall be computed on every judgment from the day on which the jury or the court, sitting without a jury, returned the verdict without regard to a motion for a new trial." Because this statute is plainly mandatory, *Vooys v. Turner*, 49 S.W.3d at 322; *Inman v. Inman*, 840 S.W.2d 927, 932 (Tenn. Ct. App. 1992); *Bedwell v. Bedwell*, 774 S.W.2d at 956, we have held that trial courts are not free to ignore it. *Stinnett v. Stinnett*, 2000 WL 1273880, at *4.

Normally, post-judgment interest begins to accrue from the date of the entry of the judgment, *Pertew v. Pertew*, No. 03A01-9711-CH-00505, 1999 WL 486917, at *10 (Tenn. Ct. App. July 13, 1999) (No Tenn. R. App. P. 11 application filed); *Inman v. Inman*, 840 S.W.2d at 932, unless the decree provides otherwise. *West American Ins. Co. v. Montgomery*, 861 S.W.2d 230, 232 (Tenn. 1993); *Inman v. Alexander*, 871 S.W.2d 153, 154 (Tenn. Ct. App. 1993). When a decree provides for one or more payments to be made in the future, the obligation to pay post-judgment interest does not begin to accrue until the obligation to pay the judgment actually matures. *Price v. Price*, 225 Tenn. 539, 544, 472 S.W.2d 732, 734 (1971); *Whiteside v. Whiteside*, No. 03A01-9707-CV-00272, 1998 WL 237715, at *11 (Tenn. Ct. App. May 7,1998) (No Tenn. R. App. P. application filed); *Beaty v. Beaty*, No. 01A01-9507-CH-00325, 1996 WL 99784, at *3 (Tenn. Ct. App. March 8, 1996) (No Tenn. R. App. P. 11 application filed).

The trial court awarded Ms. Swett $140,000 as an equitable division of the marital property. Under the order, Mr. Swett was to pay Ms. Swett within sixty days, and "[s]tatutory interest on the $140,000 will run after thirty days." Thus, Mr. Swett could have avoided paying any interest by paying Ms. Swett the $140,000 within thirty days following the entry of the judgment. However, by failing to pay the $140,000 within thirty days, interest began accruing on the unpaid amount beginning on the thirty-first day and became due and payable on the sixty-first day following the entry of the judgment. Accordingly, we find Ms. Swett's claim for post-judgment interest to be without merit.

## VI.
### MS. SWETT'S REQUEST FOR APPELLATE LEGAL EXPENSES

As a final matter, Ms. Swett requests an award from this court to defray her legal expenses on appeal. While Tenn. Code Ann. § 36-5-103(c) (2001) authorizes the award of appellate legal expenses in certain circumstances, none of these circumstances exist in this case. Ms. Swett has not been successful on any of the issues she has raised on appeal. Accordingly, we decline to award her any portion of her legal expenses.

## VII.

We affirm the judgment and remand the case to the trial court for whatever further proceedings may be required. We also tax the costs of this appeal to Grace Z. Aleman Swett and her surety for which execution, if necessary, may issue.

                                _____
                                WILLIAM C. KOCH, JR., JUDGE