**UNITED STATES of America**

v.

**Jeane Sandrine SIMO, a/k/a Sandrine Fokou.**

**No. CR. 99–234–A.**

United States District Court, E.D. Virginia, Alexandria Division.

Sept. 24, 1999.

Rita M. Glavin, Assistant United States Attorney, United States Attorney's Office, Alexandria, VA, for government.

Dale Warren Dover, Alexandria, VA, for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

This is a prosecution for the knowing and willful use of a false passport in violation of 18 U.S.C. § 1543. Pretrial motions presented, inter alia, the following two questions: (i) whether 18 U.S.C. § 1543 applies to foreign as well as United States passports, and (ii) whether defendant may assert a defense of duress based on fear of persecution in Cameroon.

### I[1]

Defendant, who claims her given name is Sandrine Jeanne Fokou,[2] was born in Cameroon. Beginning in January 1992, defendant claims her father became active in the Social Democratic Front ("SDF"), a Cameroonian political party that opposed the government's policies and candidates. He actively (and financially) supported the SDF, its candidates, and its reform agenda and efforts. The Cameroonian government police retaliated against defendant's father by harassing him and his family, arresting him several times and threatening defendant and her brother with death.

On December 12, 1998, defendant and her father were arrested by police officers while en route to an SDF meeting. They were taken to the police station, subjected to interrogation and severe beatings, and defendant's father was accused of painting his hardware store the SDF colors—apparently in contravention of police orders. Defendant was then separated from her father and taken to another room. She screamed and resisted, but the officers taped her mouth shut, threatened her with a pistol, and raped her. She was released, with the warning that she would be killed if she discussed the incident with anyone.

Her father remained in custody and died there under suspicious circumstances. Family, friends, and SDF officials arranged to have his body, which was discovered in the Bassa industrial zone, transferred to the Douala morgue. The coroner there concluded that defendant's father died of a heart problem brought on by the torture inflicted on him. The coroner also concluded that simple CPR might have saved his life.

A month later, defendant and her brother "went public," telling her story of police brutality and rape to top SDF officials. This provoked a swift response from the police, who, by summons left at their home on January 21, 1999, demanded that they appear at the police station the next morning. Fearing for their lives, defendant and her brother fled to separate towns within Cameroon, she to her aunt's house in Bassa and he to Ambam. Defendant hid in her aunt's house, while her aunt sought a way to protect her from the police. Concluding that defendant's only choice was to flee the country, her aunt procured a

---

1. The facts recounted here are based on the evidence defendant forecasted in pretrial proceedings.

2. And not "Jeane Sandrine Simo," which is the name that appears on the forged Belgian passport defendant used in this case.

Cameroonian passport with the name "Simo Jeanne Sandrine." Using this passport, defendant left Cameroon for Frankfurt, Germany on May 9, 1999, with a brief layover in Paris to change planes.[3] She claims she did not find Germany hospitable. Her contacts there, fearing the threat to their own security from the German neo-Nazi movement, would not help her file for asylum. She decided her only option was to seek the aid of family she had in the United States, and thus defendant, with the help of family and contacts in Europe and the United States, made plans to leave Europe. In this regard, she obtained from one of her European contacts a fraudulent Belgian passport[4] with her picture on it and the name "Jeane Sandrine Simo." Using this passport, she left Germany for the United States on May 26, 1999.

When she landed at Washington–Dulles International Airport later that day she presented the Belgian passport to the customs officer at the immigrations counter. The officer noticed an irregularity in the passport, namely, an extra page in the front of the passport, not found in validly issued Belgian passports. This page included spaces for filling in various vital statistics, all of which were blank.[5] His suspicions aroused, the officer referred defendant to secondary inspection for further investigation. It was there determined that the passport's number, U098226, appeared on a list of stolen Belgian passports. Defendant was charged with, and ultimately convicted of, the knowing use of a false and fraudulent passport, in violation of 18 U.S.C. § 1543.

By pretrial motion, defendant sought dismissal of the indictment on the ground that 18 U.S.C. § 1543 applies only to the use or attempted use of a fraudulent United States passport, and hence could not serve as the basis for a prosecution for use or attempted use of a false Belgian passport. Also in advance of trial, defendant advised the Court that she intended to assert a duress defense based on evidence that her experience in Cameroon and Germany gave her reason to believe she had no choice but to enter the United States by illegal means. To this end, she sought to present expert testimony concerning the political situation in Cameroon, and to testify as to her personal experience, as evidence supporting a defense of duress.[6] She also filed a proposed jury instruction on that defense.

At a pretrial hearing, the motion to dismiss the indictment was denied and the

---

3. In a post-trial hearing on defendant's motion for release pending sentencing, *see* 18 U.S.C. § 3143, evidence was adduced that suggested defendant may have spent considerably more time in France in transit to Frankfurt. Specifically, at the time of her entry into the United States, defendant was in possession of several documents, including a prescription issued in France, a message sent by facsimile to a French phone number, and a subpoena for a French proceeding, the dates of which suggest defendant may have been in France for a period longer than the claimed brief layover in Paris. The evidence also suggested that her contacts in the United States supplied her with the plane ticket she used to leave Frankfurt, as well as other documentation she carried as "proof" of the identity reflected in the fraudulent Belgian passport. None of this post-trial evidence was relied on in the disposition of the pretrial motion relating to the duress defense.

4. The government presented evidence at trial that a Belgian passport would allow defendant to take advantage of the "Visa Waiver Pilot Program." Because Belgium is a member of the treaty establishing this program, a traveler with a Belgian passport could avoid the visa and documentation requirements that would apply to a traveler seeking entry into the United States with a Cameroonian passport.

5. Testimony at trial established that when a passport is issued in Belgium, the first page is (i) filled out with the passport holder's information, (ii) removed, and (iii) filed in the issuing office as a permanent record.

6. She has since filed for political asylum in this country, claiming that were she to return to Cameroon she would be arrested, tortured, and killed.

duress defense ruled inapplicable in defendant's circumstances.

## II

 The first issue, whether 18 U.S.C. § 1543 applies to foreign as well as United States passports, is a question of statutory construction. Therefore analysis must begin with the plain language of the statute. *See United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). And, where a statute's plain language is unambiguous the judicial interpretive task is at an end; further judicial efforts to construe or interpret the statute are unnecessary and inappropriate, as the statute must then be applied in accordance with its plain meaning. *See Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 835, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990); *Rubin v. United States*, 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981); *Patten v. United States*, 116 F.3d 1029, 1035 (4th Cir.1997). When ambiguity infects a statute,[7] it is appropriate to resolve the issue through various settled rules of statutory construction and interpretation. *See United States v. Jackson*, 759 F.2d 342, 344 (4th Cir.1985).

 In this case, the beginning and the end of the analysis is the statutory language, for its plain language clearly and unambiguously applies to "any passport," not just to United States passports.[8] The

word "passport" appears five times in this statute, and the phrase "any passport" appears twice, always without qualification. The phrase "any passport" is not ambiguous, nor is there any language in the remainder of the statute that injects ambiguity into the phrase. Significantly, the entire statute is written without reference to any specific country. For example, the phrase "any passport validly issued" is written in the passive without reference to the United States as the issuing country. By contrast, 18 U.S.C. § 1542 specifically refers to "passport[s] issu[ed] under the authority of the United States." This contrasting statutory language convincingly demonstrates that Congress, when legislating on passport matters, uses precise language when it means to restrict a statute to a limited class of passports. In sum, § 1543's plain and unambiguous language forecloses defendant's attempt to limit the scope of the statute to domestic passports; the language extends to "any" passport.

The sparse case law on this issue is uniformly to the same effect. The Ninth Circuit is the only circuit that has expressly decided the issue. *See United States v. Dangdee*, 616 F.2d 1118, 1119 (9th Cir. 1980) (holding 18 U.S.C. § 1543 applies to foreign passports). Other courts, including a panel of the Fourth Circuit, have assumed without discussion that the statute would reach foreign as well as United States passports.[9] A panel of the Sixth

---

**7.** A statute may reasonably be said to be infected with ambiguity when its terms give rise to more than one meaning or interpretation. *See United States v. Murphy*, 35 F.3d 143, 145 (4th Cir.1994).

**8.** 18 U.S.C. § 1543 provides as follows:

Whoever falsely makes, forges, counterfeits, mutilates, or alters *any* passport or instrument purporting to be a passport, with intent that the same may be used; or

Whoever willfully and knowingly .uses, or attempts to use, or furnishes to another for use *any* such false, forged, counterfeited, mutilated, or altered passport or instrument purporting to be a passport, or *any* passport

validly issued which has become void by the occurrence of *any* condition therein prescribed invalidating the same [commits a crime]. (emphasis added).

**9.** *See, e.g., United States v. Abdu*, 39 F.3d 1178, 1994 WL 589474 (4th Cir. Oct.27, 1994) (applying § 1543 to a photocopy of a foreign passport); *United States v. Jibori*, 149 F.3d 125, 126 (2d Cir.1998) (applying § 1543 to use of a forged Swedish passport without discussion); *United States v. White*, 757 F.Supp. 45, 46 (D.D.C.1990), *aff'd*, 936 F.2d 1326 (D.C.Cir.1991) (applying § 1543 to the use of a fraudulent British passport without discussion); *cf. United States v. Vargas*, 380

Circuit, also in an unpublished opinion, even applied § 1543 to the use of a passport purporting to be from a country that existed only in the holder's imagination.[10] In sum, existing authority confirms § 1543's application to cases involving "any passport," including foreign passports.

Seeking to avoid this result, defendant argues that § 1543's limitation to domestic passports stems from its origin as Section 4 of Title IX of the 1917 Espionage Act, which in other sections, namely sections 1 and 2, refers to passports issued "under the authority of the United States." In fact, as noted by the Ninth Circuit, the language defendant identifies leads to the opposite conclusion. *See Dangdee*, 616 F.2d at 1119–20. The presence of limiting language in sections 1 and 2 of Title IX of the Act amplifies the *absence* of any limiting language in section 4. Had Congress wanted to limit the scope of section 4 as it had limited the scope of sections 1 and 2, it would have done so explicitly. And finally, with respect to Congress's intent in passing the act, the Ninth Circuit has convincingly determined that "the Espionage Act reflects congressional concern with controlling the activities of both United States citizens *and* foreign agents as they affect national security." *See Dangdee*, 616 F.2d at 1120. In other words, Congress designed this part of the Espionage Act to criminalize *exactly* the behavior at the heart of defendant's indictment.

### III

The second issue is whether the record, including defendant's forecasted evidence, provides a basis for a duress defense. She claims that her persecution in Cameroon and the political climate in Germany left her no choice but to attempt to enter the United States with a false passport.

▮▮▮ To establish a duress defense, the burden is on the defendant [11] to adduce evidence from which a jury reasonably could conclude (i) that defendant faced an imminent threat of death or serious bodily injury, (ii) that defendant did not recklessly expose herself to the threatening situation, (iii) that defendant had no reasonable legal alternative, either to avoiding the threat or to committing the crime, and (iv) that a direct causal relationship linked the crime and avoidance of the threat. *See United States v. Crittendon*, 883 F.2d 326, 330 (4th Cir.1989); *see also United States v. Bailey*, 444 U.S. 394, 415–16, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980) (noting that a person asserting an affirmative defense to a crime must adduce evidence supporting that defense). Even assuming as true defendant's personal and political history, she cannot establish either the imminent threat or the absence of legal alternatives required to justify the use of a false passport. A threat is imminent where it is present at or near the time of the illegal act. *See Crittendon*, 883 F.2d at 330. Although defendant here may be able to show a reasonable fear for her physical safety were she to return to Cameroon, this threat was not imminent at the time of the offense; instead, it was, at most, a threat of harm in the future. In this way, defendant's case is similar to cases in this circuit and elsewhere holding that a duress defense is inapplicable. *See United States v. King*, 879 F.2d 137, 138–39 (4th Cir. 1989).[12] For example, in *King*, the Fourth

F.Supp. 1162, 1167–68 (E.D.N.Y.1974) (assuming, at the government's request, that § 1543 applies only to United States passports, in considering the government's argument that 18 U.S.C. § 1546 applies to foreign passports).

10. *See United States v. Charczenko*, 47 F.3d 1170, 1995 WL 7961, at \*\*1–3 (6th Cir.1995) (defendant presented himself as a diplomat representing the Biblical "Nation of Israel"

(as opposed to the actual state of Israel), and offered a "diplomatic passport" as proof).

11. *United States v. Bennett*, 139 F.3d 893, 1998 WL 171353, at \*1 (4th Cir.1998) (noting that the burden is on the defendant to prove the elements of duress by a preponderance of the evidence).

12. *See also United States v. Barton*, 1999 WL 181682, at \*1 (4th Cir.1999) (showing defen-

Circuit declared that a defendant convicted of making false statements to a grand jury could not assert a duress defense, notwithstanding his having received repeated threats that he would be killed if he told the truth—those threats did not occur at or near the moment that the false statements were uttered, nor could they be carried out at that time, and were therefore not imminent.[13] Similarly, the political situation in Cameroon and Germany posed no threat to defendant as she handed the false passport to a United States customs official.

Even if defendant could identify an imminent threat of death or bodily harm on these facts, a defense of duress is unavailable because she has pointed to no evidence showing that she had no legal alternative but to present a false passport to enter the United States. *See Crittendon,* 883 F.2d at 330. For example, rather than trying to pass through United States customs using counterfeit documents, defendant could have presented herself to the customs official as a person in political exile, seeking asylum in this country. She could also have sought asylum in Germany, France, or anywhere else.[14] There was no evidence that defendant availed herself of any of these alternatives, or that she even investigated other alternatives in any meaningful way.

In sum, as defendant cannot produce evidence that she was under an imminent threat of death or bodily harm at the time she committed the crime, and also because she cannot show she had no legal alternatives to committing the crime, the duress defense is unavailable to her. Consequently, all evidence of defendant's experience in Cameroon and Germany is irrelevant and hence inadmissible at a trial on the question whether she violated 18 U.S.C. § 1543.[15]

The Clerk is directed to forward copies of this Memorandum Opinion to all counsel of record. An appropriate order has been entered.

---

dant an explosive device and threatening to use it against defendant's husband, who was not then present, was not an imminent threat to her husband's life and hence could not be the basis for a duress defense).

**13.** On one occasion, the defendant in that case was taken to a cemetery, where he had to "kneel down in front of an open grave" while being told not to cooperate with the government. *See King,* 879 F.2d at 138.

**14.** *See, e.g., United States v. Lopez–Hernandez,* 114 F.3d 1196, 1997 WL 268499 (9th Cir. 1997) (holding duress defense inapplicable for alien, who entered United States illegally, fleeing "death squads," on the grounds that he could have fled, presumably legally, to another country); *United States v. Polanco–Gomez,* 841 F.2d 235, 238 (8th Cir.1988) (holding duress defense inapplicable when defendant did not apply for asylum in the United States, did not obviously face immediate harm prior to leaving El Salvador, and could have fled to countries other than the United States).

**15.** Defendant sought to convert her duress defense into a "diminished capacity" defense, arguing that as a result of her experiences she lacked the ability to form the specific intent required to commit the crime. Federal law, however, forecloses any defense based on mental disease or defect other than the affirmative defense of insanity. *See* 18 U.S.C. § 17; *see also United States v. Hood,* 857 F.2d 1469, 1988 WL 96130, at *1 (4th Cir.1988).